PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 13-1263
———

GERARD ROSANO; JOHN ABRAHAM, and all
persons similarly situated; ROLANDO ACOSTA;
MICHAEL ADOMILLI; MARK ADOMILLI; DOUGLAS
ALCOTT; TANYA BALSER; ANTHONY BIONDI;
RONALD BOSWELL; KEVIN BRENNAN; ANTHONY
BREZI; WILLIAM BRITTINGHAM; SARA
BRITTINGHAM;
ROSS BURNS; CHRISTOPHER BUSCAVAGE;
RAYMOND BYRNE; JOSEPH CARECCIO; ROBERT
CARNEY; THOMAS CARUSO; MICHAEL CHALOUB;
HAROLD CLARK; GLENN COLEY; KENNETH
CROONQUIST; ROBERT CROONQUIST;
WILLIAM CROONQUIST; MICHAEL CROWLEY;
DANIEL DALESSIO; MICHAEL DANENZA; JAMES
DEANNI; ARMAND DIVITE; KENNETH EGBERT;
JOHN FAGGELLO; MICHAEL FALVEY; MICHAEL
FERRANTE; PAUL FINKLER; THOMAS FINLEY;
MARK FISCO; PATRICK FORREST; DANIEL GARCIA;
JOHN GARCIA; ROBERT GLORIA; JOSE GONZALEZ;
WALTER HAASE; EDWARD HAHN; HARRY
HARRISON;
ROBERT HARVEY; JASON HOSEY; JOHN HYLAND;
KIMBERLY JOHNSON; DEAN KAZINCI; EDWARD
KAZMIERCZAK; GREGORY KERRISON; DENNIS

KLEIBER; SETH KRIEGEL; CHRISTOPHER KURSCHNER; EDDY LIEVANO; RALPH LOCKE; ZORAIDA LOPEZ; CRAIG LUEBECK; KEVIN MARRERO; ANDREW MCGURR; LAMON MEEKS; ROBERT MEHNERT; THOMAS MELVIN; GEORGE MIROS; MICHAEL MOLIERE; GEORGE MOLINA; RANDY MORALES; CHARLES MULLIGAN; JOHN NOGUERAS; JAMES O'BRIEN; GLENN O'REILLY; SPENCE OSAIGBOVO; ANGEL PAGAN; ARNO PETERS; STEPHEN RAMIREZ; KEITH RICHTER; MICHAEL RICHTER; JUSTIN RODRIGUEZ; GREGORY RUCKER; RODNEY RYLAND; SAUL SANTIAGO; GABRIEL SANTIAGO; THOMAS SULLIVAN; MICHAEL SUNGA; SCOTT TESSER; JAMES THOMPSON; VERONICA THORNTON; THOMAS TULLY; PERCY WEST; JEANETTE WILLIAMS; GEORGE WRIGHT,
Appellants

v.

TOWNSHIP OF TEANECK, a political subdivision of the State of New Jersey

_____

On Appeal from United States District Court for the District of New Jersey
(D. NJ. No. 2-09-cv-06339)
District Judge:  Honorable Katharine S. Hayden

_____

Argued October 29, 2013
Before:  McKEE, *Chief Judge*, FISHER and SLOVITER, *Circuit Judges*.

2

(Filed: June 10, 2014)

Marcia J. Tapia, Esq.  **ARGUED**
Loccke, Correia, Schlager, Limsky & Bukosky
24 Salem Street
Hackensack, NJ 07601
          *Counsel for Appellants*

Peter F. Berk, Esq.
Angelo J. Genova, Esq.  **ARGUED**
Genova Burns Giantomasi & Webster
494 Broad Street
6th Floor
Newark, NJ 07102
          *Counsel for Appellee*

_____

OPINION

_____

FISHER, *Circuit Judge*.

This case arises from an action brought by eighty-eight current and former police officers ("Appellants") employed by the Township of Teaneck ("Teaneck") in Teaneck, New Jersey.  Appellants contended that Teaneck violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, by failing to: (1) pay proper overtime; (2) provide compensation for time spent attending daily roll calls ("muster time"); and (3) provide compensation for time spent putting on ("donning") and taking off ("doffing") uniforms and

3

equipment each day. The District Court granted summary judgment in favor of Teaneck on all of Appellants' claims. For the reasons set forth below, we will affirm.

## I. BACKGROUND

### A. Factual Background

The Teaneck Policemen's Benevolent Association, Local 215, which represents Teaneck police officers, and the Superior Officer's Association, which represents Teaneck sergeants, lieutenants, and captains, have negotiated jointly with Teaneck since 1979. The present dispute has its origins in a collective bargaining agreement (the "Agreement") that was in effect for an original term of January 1, 2004 to December 31, 2007, and which remained in effect through June 2011 due to an impasse in negotiations.

### 1. Overtime Compensation

The Agreement provides that police officers work established and regularly recurring work periods of either seven or nine days. These periods combine so that police officers are required to work an average of 39.25 hours per week over the course of a calendar year. Officers work under either a "Six and Three" or a "Five and Two" plan. Those working under the "Six and Three" plan work six eight-hour tours over six consecutive days and then have three consecutive days off. Those under the "Five and Two" plan work five eight-hour tours over five consecutive days and then have two consecutive days off.

If an officer performs work in excess of his or her normal hours in any tour of duty, that work is considered

4

overtime which is compensated at a rate of time and one-half. The Agreement provides for the accrual of overtime pay in blocks based on the amount of time worked after a regular tour. For example, if an officer works less than 31 minutes past his scheduled tour, he receives no overtime; if the officer works between 31 minutes and 44 minutes past his scheduled tour, he receives 30 minutes of overtime; if he works between 45 and 52 minutes past his scheduled tour, he receives 45 minutes of overtime; and if he works between 53 and 59 minutes past his scheduled tour, he receives one hour of overtime. Any overtime beyond one hour accrues in blocks of 15 minutes.

*2. Muster Time*

The Agreement also provides for inspection and roll call, or "muster time," which takes place ten minutes prior to the start of officers' tours and ten minutes at the end of their tours. Officers are required to report for muster time dressed and prepared for duty. The effect of muster time is that for each eight-hour tour, officers may work for eight hours and twenty minutes. On any given day, officers may work less than the eight hours and twenty minutes depending on the length of the post-tour muster period. In those instances, officers are still given credit for the full eight hours and twenty minutes.

*3. Donning & Doffing*

The Agreement also sets forth specific uniform and equipment requirements to which Teaneck police officers must adhere while on duty. The uniform components of individual police officers depend on whether the officer is

5

assigned to the "Uniform Division" or the "Non-Uniform Division."

Regardless of assignment, there is no rule, regulation, or other policy requiring that police officers don or doff their uniform at Teaneck Police Headquarters. However, some officers choose to don and doff partially at home and partially at work, and some choose to don and doff completely at Teaneck's headquarters, either in the locker rooms or their personal offices. The option to change at work is primarily for the benefit of police officers who have indicated concerns regarding:

> (1) the risk of loss or theft of uniforms and gear at home; (2) potential access to the gear by family members; (3) distractions at home that might interfere with the donning process; (4) safety concerns with performing firearm checks at home; (5) discomfort associated with wearing the gear while commuting; (6) the increased risk of being identified as a police officer while off-duty; and (7) potential exposure of family members to contaminants and bodily fluids.

App. at 115.

The Agreement, as well as all prior collective bargaining agreements between the parties, is silent as to whether Teaneck officers are entitled to compensation for time spent donning and doffing. Additionally, the officers' unions have never requested, through contract negotiations or other means, compensation for time spent donning and doffing.

## B. Procedural Background

On December 16, 2009, Local 215 filed a complaint against the Township of Teaneck under the FLSA to recover unpaid compensation for: (1) overtime; (2) time spent during muster time; and (3) time spent donning and doffing uniforms and equipment each day. On June 9, 2010, an amended complaint was filed which removed Local 215 as a party to the suit and left only the officers, in their individual capacities, as plaintiffs.

Teaneck subsequently filed a motion to dismiss, but the motion was terminated when the District Court stayed the case and directed the parties to mediation. Following an unsuccessful mediation, the District Court held a pre-trial conference, at which Teaneck moved under Federal Rule of Civil Procedure 37(c)(1) to bar the officers from using any damages calculations that were not disclosed during discovery. To that point, the only calculation of damages the officers had disclosed during the discovery process was a spreadsheet prepared by one of the officers' wives, which calculated individual officers' overtime hours based upon an eight-hour day.

The spreadsheet identified the dates each officer worked and those in which the officer was in uniform and not

7

in uniform. It assumed that each officer worked eight hours, plus 20 minutes in muster time, plus 30 minutes daily donning and doffing for uniformed officers and 15 minutes daily donning and doffing for non-uniformed officers. Thus, according to the officers, they were entitled to overtime compensation for every day they worked 8 hours, regardless of how many hours they worked in a workweek or a work period. The officers conceded that they did not produce anything in discovery that would provide a computation of damages under a 40-hour theory, but defended that course of action based upon their perception that the Agreement required overtime payment based upon an eight-hour day and not a 40-hour work week. After hearing argument, the District Court concluded that there was "no reason why there should be any permission to go beyond that which was disclosed in discovery" and granted Teaneck's motion.

Thereafter, the parties filed cross-motions for summary judgment. The District Court granted Teaneck's motion and denied the officers' motion on December 28, 2012. In regards to the officers' overtime claim, the Court concluded that Teaneck qualified for an exemption to the general overtime provisions of 29 U.S.C. § 207(a)[1], pursuant to 29 U.S.C. §

---

[1] *See* 29 U.S.C. § 207(a)(1) (". . . no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.").

207(k) [2], and could, therefore, raise the overtime threshold for its employees.  The Court also noted that the officers had failed to produce sufficient evidence of missed overtime pay.  Regarding muster time, the Court concluded that the Agreement contemplated such time as part of the "normal hours in any tour of duty" and was already a component of the officers' salaries.  Finally, because the officers had the option of donning and doffing their uniforms and gear at home, and the option to change at work benefitted the officers and not Teaneck, the District Court regarded such activities as preliminary and postliminary to the principal activity of police work and, therefore, were non-compensable under the FLSA.  The District Court also noted that § 203(o) of the FLSA, which excludes donning and doffing "from measured working time under the Agreement," provided an additional basis for denying the officers' donning and doffing claim.

The officers' timely notice of appeal to this Court followed.

## II.  JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).  We have appellate jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review over a district court's grant of summary judgment.  *Madison v. Res. for Human Dev., Inc.*, 233 F.3d 175, 180 (3d Cir. 2000).  Summary judgment will be proper "if the pleadings, depositions,

---

[2] *See* 29 U.S.C. § 207(k) (increased employment overtime thresholds for public agencies engaged in fire protection or law enforcement activities).

answers to interrogatories . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In exercising such review, "[w]e view all evidence and draw all inferences in the light most favorable to the non-movant, affirming if no reasonable jury could find for the non-movant." *Madison*, 233 F.3d at 180 (citing *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177, 180 (3d Cir. 1999)).

Our review of a district court's interpretation of the FLSA is plenary. *Id.* (citing *Stephens v. Kerrigan*, 122 F.3d 171, 176 (3d Cir. 1997).

## III. DISCUSSION

Appellants' challenge to the District Court's order is based upon a series of alleged factual and legal errors. Specifically, Appellants argue that the District Court erred in finding that: (1) Teaneck qualified for an exemption to the general overtime provisions, pursuant to § 207(k); (2) Appellants failed to meet their burden in establishing damages; (3) Appellants are compensated for muster time as a component of their salaries; (4) donning and doffing police uniforms and gear is non-compensable under the FLSA; and (5) § 203(o) of the FLSA forecloses Appellants from seeking compensation for donning and doffing. We will address each argument in turn.

## A. Overtime Compensation

*1. The § 207(k) Exemption*

Under the FLSA, employers are generally required to pay employees at overtime rates for work in excess of forty hours per workweek. 29 U.S.C. § 207(a)(1). Section 207(k), however, contains a partial exemption from the general overtime provisions, permitting public agencies to establish a "work period" that lasts from seven to 28 days for employees engaged in law enforcement or fire protection activities. 29 U.S.C. § 207(k). The FLSA's interpretative regulations define the term "work period" as "any established and regularly recurring period of work." 29 C.F.R. § 553.224(a).

The exemption operates mainly "to soften the impact of the FLSA's overtime provisions on public employers . . . [by] rais[ing] the average number of hours the employer can require [employees] to work without triggering overtime requirement[s]." *O'Brien v. Town of Agawam*, 350 F.3d 279, 290 (1st Cir. 2003); *see also Lawrence v. City of Philadephia*, 527 F.3d 299, 303 (3d Cir. 2008) (recognizing that § 207(k) exempts certain public agencies from the overtime requirements set forth in § 207(a)). It also "accommodates the inherently unpredictable nature of firefighting and police work by permitting employers to adopt work periods longer than one week." *Id.* Before a public employer may qualify for the § 207(k) exemption, however, two things must be true: (1) "the employees at issue must be engaged in fire protection or law enforcement within the meaning of the statute and (2) the employer must have established a qualifying work period." *Calvao v. Town of Framingham*, 599 F.3d 10, 14 (1st Cir. 2010) (citing *Agawam*, 350 F.3d at 290). The employer bears the burden of proving that these conditions are satisfied. *Guthrie v. Lady Jane Collieries, Inc.*, 722 F.2d 1141, 1143 (3d Cir. 1983) (noting that "[t]he burden of proof is on the employer to establish an [FLSA] exemption"); *see*

11

*also Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). To meet this burden, the employer must demonstrate "that the employee and/or employer come 'plainly and unmistakably' within the exemption's terms." *Lawrence*, 527 F.3d at 310 (observing that FLSA exemptions should be construed narrowly and against the employer (citing *Arnold*, 361 U.S. at 392)).

In the instant case, neither party disputes that Teaneck police officers are engaged in law enforcement within the meaning of the FLSA; thus, the only issue before us is whether Teaneck established a qualifying work period. Appellants argue that it was error for the District Court to conclude that Teaneck qualified for and established a valid § 207(k) work period because Teaneck never intended to adopt the exemption. Teaneck, on the other hand, argues that an employer's burden under § 207(k) does not require a demonstration of intent. The point of contention between the parties, namely, the means by which a law enforcement employer may establish a valid § 207(k) work period, is a matter of first impression for this Court.

This question presents an issue of statutory interpretation. "As with any question of statutory interpretation, our analysis begins with the plain language of the statute." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009). We note first that the text of § 207(k) does not specify how an employer establishes a qualifying work period. However, one thing is quite clear – nothing in the language of the statute requires employers to express their intent to qualify for or operate under the exemption. *See* 29 U.S.C. § 207(k) ("No public agency shall be deemed to have violated subsection (a) of this section with respect to the employment of any employee in . . . law enforcement

activities if [certain scheduling requirements are met]."). As Teaneck correctly observes, the statute only requires the existence of a qualifying work period. Nothing more. We will, therefore, decline to adopt a rule that requires employers to clear a hurdle not provided for in the statutory text. Accordingly, we hold that employers seeking to qualify for the § 207(k) exemption need not express an intent to qualify for or operate under the exemption. Employers must only meet the factual criteria set forth in § 207(k).

Appellants urge that two district court cases, *O'Hara v. Menino*, 312 F. Supp. 2d 99 (D. Mass. 2004) and *Ackley v. Department of Corrections*, 844 F. Supp. 680, 687 (D. Kan. 1994), support a different outcome. In *O'Hara*, a group of police officers brought an action against the city in which they worked, alleging violations of the FLSA regarding overtime compensation. 312 F. Supp. 2d at 103. The district court in that case concluded that the city was not entitled to the § 207(k) exemption because it had neither adopted a qualifying work period during the time at issue, nor was one in place. *Id.* at 106. The court relied on language found in a footnote in *Agawam*, which noted that employers were required to "announce and take bona fide steps to implement a qualifying work period" in order to take advantage of the § 207(k) exemption. *Id.* at 105 (citing *Agawam*, 350 F.3d at 291 n.21).

Similarly, in *Ackley*, the district court held that the defendant had not met its burden of proving that it adopted a § 207(k) workweek exemption. *Ackley v. Dep't of Corrs.*, 844 F. Supp. 680, 687 (D. Kan. 1994). The district court relied on an interdepartmental memorandum pertaining to overtime compensation, which stated that all non-exempt employees were eligible for overtime compensation for hours

13

worked in excess of 40 hours in a work week. *Id.* Based upon this memorandum, the district court concluded that the employer compensated its employees in accordance with § 207(a). *Id.* The district court concluded that the employer failed to produce any evidence that would contradict such a conclusion, and made note that the employer's § 207(k) argument appeared to have only been raised after suit was filed to avoid liability. *Id.* Appellants rely on *Ackley* to support their argument that Teaneck's Personnel Policies and Procedures Manual (the "Manual"), as well as testimony from Teaneck Police Department personnel, prove that the § 207(k) exemption should not apply to Teaneck. Regarding the Manual, Appellants contend that the document fails to provide any indication that overtime payment for officers would be in accordance with § 207(k). Regarding the testimony, Appellants assert that not one agent of Teaneck could even testify as to what the § 207(k) exemption was or whether it had been adopted.

Neither *O'Hara* nor *Ackley* alter our analysis. Appellants' reliance on *O'Hara*, as well as the footnote citing to a First Circuit decision, is unpersuasive and foreclosed by more recent case law from the First Circuit, which rejects the notion that an employer is required to expressly state its intent to adopt a § 207(k) work period. *See Calvao*, 599 F.3d at 16 ("On the undisputed facts, the Town's actions were sufficient to establish a qualifying work period, despite the asserted lack of notice to its employees."). The instant case can be further distinguished from *O'Hara* because the employer in that case never implemented a qualifying work period, which played a significant role in the outcome of the case. Here, Appellants do not argue that Teaneck's "Five and Two" and "Six and Three" plans fail to meet the requirements of § 207(k). Their

14

only argument is that Teaneck never made its intent to adopt the § 207(k) exemption known, which is not a requirement under § 207(k).

Appellants' reliance on *Ackley* is also foreclosed by more recent case law from the Tenth Circuit, which rejects a requirement that an employer expressly intend to adopt a § 207(k) exemption. *See Spradling*, 95 F.3d at 1505 (stating that an employer may establish a § 207(k) work period either by public declaration or by actually meeting the requirements of the exemption). Appellants' reliance on *Ackley* is further tainted by factual differences between that case and the instant case. There, the district court noted that the defendant failed to produce *any* evidence that it defined a work period as 28 days and had actually compensated its employees in accordance with § 207(a). Here, the undisputed facts, as well as current and former Agreements, reveal that officers work and are paid in accordance with "established and regularly recurring work periods" of either seven or nine days. Finally, as concluded above, the relevant inquiry into whether an employer has established a qualifying work period does not include a subjective component. Nor is there a requirement that employers make a public declaration or an express statement that the work period has been or will be adopted. Thus, Appellants' argument regarding the Manual and the testimony of Teaneck personnel also fails.

Finally, we note that our holding here is in accordance with that of our sister Circuits. All courts of appeals to consider this issue have held that, in order for an employer to qualify for the § 207(k) exemption, only a factual inquiry is involved and no notice or declaration of intent is required on the part of the employer. *See, e.g., Calvao*, 599 F.3d at 12 (rejecting the plaintiffs' argument that the Town was required

15

to notify affected employees before establishing a valid work period under § 207(k)); *Barefield v. Vill. of Winnetka*, 81 F.3d 704, 710 (7th Cir. 1996) (noting that nothing in the language of § 207(k) requires employers to express a "declaration of intent" to qualify for the exemption – an employer need only meet the factual criteria); *Milner v. Hazelwood*, 165 F.3d 1222, 1223 (8th Cir. 1999) (holding that FLSA police and firefighters exemption need not be established by public declaration); *Spradling v. City of Tulsa*, 95 F.3d 1492, 1505 (10th Cir. 1996) (stating that an employer may establish a § 207(k) work period either by public declaration or by actually meeting the requirements of the exemption); *Freeman v. City of Mobile*, 146 F.3d 1292, 1297 n.3 (11th Cir. 1998) (rejecting Appellants' argument that the City never "intended" to avail itself of the § 207(k) exemption).

Turning to the merits of the instant appeal, the record clearly demonstrates that Teaneck adopted a valid § 207(k) work period. The Agreement provides, and Appellants concede, that police officers work either a seven-day or a nine-day period on a regularly recurring basis. Indeed, Appellants fail to even assert now that they do not work a seven-day or a nine-day schedule. Appellants' only contention is that the exemption does not apply because Teaneck did not *intend* to do so, which we now conclude is irrelevant as to whether an employer meets the requirements of § 207(k). Because neither party disputes that the Teaneck police officers are engaged in law enforcement within the meaning of the FLSA, and the record supports a finding that the officers work either a seven-day or a nine-day schedule on a regularly recurring basis, it was proper for the District Court to conclude that Teaneck qualified for the § 207(k) exemption.

16

## 2. Calculation of Overtime Damages

When an employee brings a claim under the FLSA, he ordinarily bears "the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680, 687 (1946), *superseded by statute,* Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-262, *as recognized in IBP, Inc. v. Alvarez*, 546 U.S. 21, 25-26 (2005); *see also Reich v. Gateway Press, Inc.*, 13 F.3d 685, 701 (3d Cir. 1994). Because the FLSA requires every employer to keep records of the "wages, hours, and other conditions and practices" of its employees, 29 U.S.C. § 211(c), an employee easily discharges this burden by securing the production of those records, *Anderson*, 328 U.S. at 687. Such a burden becomes difficult to meet, however, where an employer has not maintained its records. *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1297 (3d Cir. 1991). Under those circumstances, "[t]he burden of any consequent imprecision [in an employee's calculation of damages] must be borne by th[e] employer," *id.* (citing *Anderson*, 328 U.S. at 688), and the employee will only be required to "submit sufficient evidence from which violations of the [FLSA] and the amount of an award may be reasonably inferred." *Id.* Once this inference is created, the burden shifts to the employer to rebut that inference. *Id.* (citation omitted).

Appellants argue that the District Court erroneously applied the burden of proof standard when it concluded that they failed to establish overtime damages. Appellants argue that Teaneck's records were so inaccurate as to render the proper calculation of damages impossible and, therefore, the burden of proof should have been shifted to Teaneck to rebut Appellants' proffered evidence. Teaneck, on the other hand, argues that it did maintain adequate employment records.

17

Teaneck points out, however, that the District Court's entry of summary judgment resulted not from a failure to shift the burden of proof, but from Appellants' failure to set forth *any* evidence of alleged uncompensated overtime, whether it be actual or estimated.

We agree with Teaneck's characterization of the District Court's opinion. The District Court highlighted the fact that the only evidence submitted by the officers of alleged overtime damages was a spreadsheet, which based its calculations on the assumption that overtime accrued for any time worked beyond an eight-hour tour. As the District Court correctly observed, such a framework does not provide any basis for discerning whether the hours worked by each individual officer exceeded the necessary threshold for overtime under the FLSA, which defines overtime entitlement based upon a work period and not a work day. *See, e.g.*, 29 U.S.C. § 207(a)(1) ("no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for [the excess hours] . . ."). The spreadsheet also fails to account for Teaneck's exemption under § 207(k), which increases the number of hours Teaneck officers may work in a work period before triggering overtime requirements. *See* 29 C.F.R. § 553.230(c) (overtime threshold of 43 hours for seven-day cycles and 55 hours for nine-day cycles). An estimation of damage, which fails to set forth the proper method of calculation and does not account for day-to-day differences in officer scheduling, hardly provides a foundation for an inquiring court to "reasonably infer[]" FLSA violations or the amount of an award. *Martin*, 949 F.2d at 1297.

To be clear, the spreadsheet did indeed provide an estimation of muster time and time spent donning and

18

doffing, but it failed to make clear whether each officer worked the entirety of his or her tour or how that tour fit into each officer's broader work period. Such a failure proves key here. The uncontested facts demonstrate that: (1) a Tour Commander handwrites each officer's scheduled hours on a "Daily Blotter", App. at 97; (2) the Daily Blotter records regularly scheduled hours, as well as muster time, overtime worked on a given day, sick time, vacation days or time due, and any shift exchanges among officers, *id.*; (3) Teaneck maintains, in addition to the Daily Blotter, records of the time officers actually work overtime pursuant to the Agreement, App. at 106; (4) when officers work overtime, they are required to punch a timecard, after which approval is obtained by a superior officer and eventually the Chief officer, *id.*; (5) officers are permitted to "sign out" with the Tour Commander during the last ten minutes of their eight hour and twenty minute tour, but still receive credit for the full eight hours and twenty minutes; and (6) Teaneck maintains overtime records, which reflect the reason for the overtime, necessary approvals for it, the method of compensation for it, and the overtime both worked and paid pursuant to the Agreement, *id.*

Despite all of the above information, Appellants conceded that not a single officer was able to provide an estimate of his or her uncompensated overtime damages or time worked for which they believe they were not compensated. App. at 116. They also conceded that they were unable to provide any documentation that could be used to refute the hours set forth in Teaneck's records. *Id.* Amidst all of their concessions, Appellants do not argue that they lacked access to the records maintained by Teaneck, nor are

19

there any allegations that Teaneck withheld those records. [3] Absent any evidence to support the officers' estimates of their overtime damages, Appellants' calculations on the spreadsheet become mere speculation, and are insufficient to support the requisite inference necessary to meet their burden. *Martin*, 949 F.2d at 1297 (the employee must "submit *sufficient evidence* from which violations of the [FLSA] and the amount of an award may be *reasonably inferred*.") (emphasis added). Because Appellants had the burden of proving that they performed work for which they were not properly compensated, and failed to do so, the District Court

---

[3] To be clear, our analysis does not reach the issue of whether Teaneck's records were adequate for purposes of recordkeeping requirements under the FLSA. Our analysis merely notes that the parties do not dispute that certain records were made and highlights the fact that none of those records were used to support or refute estimates of overtime damages.

properly granted summary judgment on their claim for overtime damages.[4]

## B. Muster Time

Appellants next argue that the District Court incorrectly interpreted the Agreement in reaching the conclusion that Teaneck officers are compensated for muster time as a component of their base salaries. They contend that the Agreement provides that officers are paid based upon an eight-hour tour of duty and, therefore, the additional twenty minutes of daily muster time constitutes time for which they are uncompensated. Teaneck, on the other hand, argues that officers are paid for muster time as a component of their base salaries, and that officers have always been aware of this arrangement. Teaneck points out that the parties have

---

[4] Appellants dedicate a significant portion of their brief to arguments in support of their position that Teaneck failed to maintain its records. Based upon this allegation, Appellants claim that the District Court should have "shifted the burden of proof" to Teaneck to rebut their proffered evidence of overtime damages. As our analysis sets forth above, this argument misses the mark. Regardless of whether Teaneck maintained its records or not, Appellants still had the burden, albeit more relaxed in the latter situation, to prove entitlement to overtime damages. *See Martin*, 949 F.2d at 1297 (noting that, where an employer has failed to maintain adequate records, the employee will only be required to "submit sufficient evidence from which violations of the [FLSA] and the amount of an award may be reasonably inferred."). Because Appellants failed to set forth *any* evidence that would assist in even *estimating* damages, Appellants have not met their burden under either standard.

negotiated terms of employment and compensation for years through collective bargaining and it would make little sense for the officers to repeatedly enter into an agreement under which they performed uncompensated work. This dispute, as the District Court correctly observed, presents a matter of contract interpretation.

Although federal law governs the construction of a collective bargaining agreement ("CBA"), traditional rules of contract interpretation apply when not inconsistent with federal labor law. *Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993). "[W]here a court is called on to interpret a [CBA] it is generally appropriate for the court to look beyond the face of the [CBA]." *Se. Pennsylvania Transp. Auth. v. Bhd. of R.R. Signalmen*, 882 F.2d 778, 784 (3d Cir. 1989). The Supreme Court has affirmed this method of interpretation because:

> A [CBA] is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. It is a generalized code to govern a myriad of cases which the draftsman cannot wholly anticipate. The collective agreement covers the whole employment relationship. It calls into being a new common law – the common law of a particular industry.

*Transp.-Commc'n Emps. Union v. Union Pac. R.R.*, 385 U.S. 157, 161 (1966) (citations and internal quotation marks omitted). Thus, when interpreting such agreements, "it is necessary to consider the scope of other related [CBAs], as well as practice, usage and custom pertaining to all such agreements." *Id.*

Appellants set forth a number of arguments to support their position that muster time constitutes time for which officers are uncompensated. None of those arguments provide any basis upon which we can rely in interpreting the Agreement and the employment relationship between the parties "as a whole." For example, Appellants direct our attention to a section of the Agreement that states that officers are required to work an average of thirty-nine and a quarter hours per week over a calendar year cycle. Appellants claim that it is "mathematically impossible to arrive at an eight-hour and twenty-minute tour and still work an average of thirty nine and a quarter hours per week." We find this argument to be flawed. The key language here is that officers work an *average* of thirty-nine and a quarter hours per week over a *calendar year cycle*. The implication underlying this language is that some weekly hours will exceed that average and others will not. Appellants concede that officers have been able to leave prior to the time indicated on the Daily Blotter and that they often do not actually attend twenty minutes of muster time per day. Thus, it would appear that the Agreement accounts for early release, as well as the possibility of officers having to stay for a few extra minutes. Regardless, Appellants' calculations provide no basis for this Court to conclude, on the whole, that muster time is not compensated as a component of the officers' base salaries.

The same can be said for Appellants' next argument. Appellants claim that the Agreement provides for overtime based on an eight-hour day, rather than an eight-hour and twenty-minute day. Appellants point out that the Agreement provides for full overtime compensation once officers reach the overtime threshold; thus, it defies reason that Teaneck would pay twice for time it already deems compensated. Again, this argument fails to prove one way or another whether muster time is compensated as a component of the officers' base salaries. The mere fact that the parties may have negotiated a generous overtime compensation package once a threshold timeframe is met provides little assistance in analyzing the question of muster time compensation.

Finally, Appellants direct our attention to two cases which they believe support their position that muster time should be compensated separately from their regular work schedules. *See O'Brien v. Town of Agawam*, 350 F.3d 279, 298 (1st Cir. 2003) (concluding that roll-call pay had to be included in officers' weekly hours worked under the FLSA and compensated as overtime since it pushed the officers' weekly hours worked over the forty-hour threshold); *Barvinchak v. Ind. Reg'l Med. Ctr.*, 2007 U.S. Dist. LEXIS 72805 (W.D. Pa. Sept. 28, 2007) (analyzing the viability of a claim for straight time compensation under the FLSA where the plaintiff has worked overtime under § 207). However, neither of those cases align factually with that of the instant case, nor does the same legal standard apply. The Court in *O'Brien*, for example, found that the employer failed to establish a qualifying work period under § 207(k). As a result, the employer was required to adhere to overtime requirements set forth in § 207(a)(1), which required that it pay overtime once an officer's weekly hours exceeded the 40-

hour threshold. *O'Brien*, 350 F.3d at 297. Here, Teaneck has established its eligibility for the § 207(k) exemption, so the overtime threshold for Teaneck officers is 43 hours for officers under the seven-day work plan and 55 hours for those under the nine-day plan. *See* 29 C.F.R. § 553.230(c). Twenty minutes of daily muster time for Teaneck officers, regardless of whether they work a "Five and Two" plan or the "Six and Three" plan, does not push them over the applicable overtime thresholds as it did in *O'Brien*. Appellants' reliance on *Barvinchak* is similarly flawed as the Court's analysis was also based upon an overtime threshold of forty hours.

Turning to the Agreement in the instant matter, we think it is clear that muster time was contemplated as a component of the officers' base salaries. Article VII of the Agreement sets forth that "[a] normal tour of duty shall be an eight (8) hour time division of the day *for the purposes of assignment*." *See* App. at 96 (emphasis added). That same section goes on to state that "[e]mployees will report for duty ten (10) minutes prior to the start of their tour . . . and . . . will be dismissed from duty ten (10) minutes after the end of their tour." *Id.* The only reasonable interpretation of this language is that an officer's work schedule, on any given day, is eight hours and twenty minutes. Such a reading would therefore encompass the tour of duty, the assignment, and pre- and post-tour muster time. This reading of the Agreement lends itself to the conclusion that muster time is a required component of an officer's daily tour schedule, a fact that both parties were aware of at the time employment-related negotiations took place.

We note that our conclusion is reinforced by the parties' extensive history of collective-bargaining negotiations, which began in 1979 and continued every few

25

years thereafter. There is no indication that muster time has ever been treated as a separate entity from an officer's normal tour of duty, or that it was ever compensated separately. Nor is there any indication that the officers disputed the arrangement. Taking the Agreement as a whole, combined with the actions of both parties over the course of thirty years, we conclude that Teaneck officers are compensated for muster time as a component of their negotiated salaries. Accordingly, we will affirm the District Court's grant of summary judgment as it relates to Appellants' claim regarding muster time.

## C. Donning and Doffing

Appellants assert various arguments regarding their donning and doffing claim, including allegations that the District Court: (1) failed to consider that their uniforms are necessary to the principal work performed by the officers; (2) erred in holding that the uniforms are not for the benefit of the employer; (3) erred in concluding that § 203(o) of the FLSA applied to police uniforms; and (4) failed to consider their claim regarding safety equipment. The arguments set forth by Appellants essentially claim that two exclusions to the wage and hour requirements, the Portal-to-Portal Act of

1947[5] and § 203(o), do not apply to their daily donning and doffing. Because the § 203(o) exclusion speaks directly to the issue of clothes-changing time where a CBA governs the employment relationship between an employer and its employees, and a CBA governs the relationship between Teaneck and its officers, that is where we will begin our analysis.

Section 203(o) of the FLSA sets forth that, when determining hours worked for purposes of the wage and hour laws:

> [T]here shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee.

---

[5] The Portal-to-Portal Act of 1947 relieves employers of responsibility for compensating employees for activities which are preliminary or postliminary to the principal activity or activities of a given job. *See* 29 U.S.C. § 254(a)(2); *Alvarez*, 546 U.S. at 27. Preliminary and postliminary activities are compensable under the FLSA only where "those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by [§ 254(a)(1)]." *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956).

29 U.S.C. § 203(o); *Turner v. City of Philadelphia*, 262 F.3d 222, 224-25 (3d Cir. 2001). Essentially, where a CBA governs the relationship between an employer and its employees, employees will be foreclosed from seeking compensation for donning and doffing if the following are true: (1) donning and doffing was excluded from measured working time by the express terms, or by custom or practice, of a CBA; and (2) the donning and doffing involves clothes. *See* 29 U.S.C. § 203(o). We will address each element in turn.

*1. The Agreement*

We note first that the express terms of the Agreement in this case are silent as to whether Teaneck officers are entitled to compensation for time spent donning and doffing. We, therefore, must determine whether there is a "custom or practice" under the Agreement of excluding change time from compensable hours worked.

We confronted this issue head on in *Turner v. City of Philadelphia*. In that case, 200 current and former corrections officers brought a class action suit against the City of Philadelphia and the City Prisons Commissioner seeking overtime compensation under the FLSA for the time they spent changing into and out of their uniforms. 262 F.3d at 224. The express terms of the applicable CBA between the parties did not mention an exclusion of change time from hours worked and, therefore, the dispositive issue was whether there was a "custom or practice under a bona fide

28

collective-bargaining agreement" in the corrections system of excluding change time from compensable hours worked. *Id.* at 225. We concluded that there was. *Id.* at 227. In reaching this conclusion, we highlighted the district court's reliance on the following undisputed facts: (1) the employer had not compensated corrections officers for change time for over thirty years; (2) every agreement between the officers and the employer had been silent as to compensation for uniform change time; (3) the union never made any requests for a uniform maintenance allowance or overtime compensation for mandatory pre-shift roll calls; and (4) the union never filed a grievance or demand for arbitration based on a lack of compensation for change time. *Id.* at 225. Because the facts established the officers' long-standing acquiescence to a "custom or practice" of the non-compensability of change time, we affirmed the district court's conclusion. *Id.* at 227.

The instant case is factually similar to *Turner*. The record demonstrates that the relationship between Teaneck and its police officers has been governed by CBAs for the past thirty years. App. at 88. During that time, and over the course of various periods of negotiation, none of the agreements have compensated police officers for change time. App. at 116. The record makes clear that the police officers' unions neither requested compensation for change time during those negotiations, nor did they even consider raising the issue. *Id.* Indeed, Appellants concede that Teaneck officers were aware that Teaneck had a policy of not providing additional compensation for donning and doffing and the unions never even filed a grievance or demand for arbitration based on such non-compensability. *Id.* Those facts certainly establish a longstanding acquiescence on the part of the officers and the unions to a "custom or practice" of

non-compensability of change time.  Because the facts indicate that there is a custom or practice under a bona fide CBA of not compensating Teaneck officers for time spent donning and doffing, the first element of § 203(o) applies.

*2. Time Spent "Changing Clothes"*

The Supreme Court recently defined the term "clothes," as used in § 203(o), as "items that are both designed and used to cover the body and are commonly regarded as articles of dress." *Sandifer v. United States Steel Corp.*, 134 S. Ct. 870, 877 (2014).  While the Court noted that its definition clearly "leaves room for distinguishing between clothes and wearable items that are not clothes, such as some equipment and devices," *id.* at 878, it cautioned that its "construction of 'clothes' does not exclude all objects that could conceivably be characterized as equipment," *id.* at 878 n.6.

Where a court assesses the compensability of particular items for purposes of § 203(o), and the items in question fall within the above-stated definition of "clothes," time spent changing into and out of those items would be non-compensable.  *See* 29 U.S.C. § 203(o).  The analysis becomes more challenging where some items fall within the definition and others do not.  Mindful of the onerous task that would face federal judges when "separating the minutes spent clothes-changing and washing from the minutes devoted to other activities," the Supreme Court set forth the following guidelines:

> The question for courts is whether the period at issue can, *on the whole*, be fairly characterized as 'time spent in changing clothes or washing.' If an employee devotes the vast majority of the time in question to putting on and off equipment or other nonclothes items . . . the entire period would not qualify as 'time spent in changing clothes' under § 203(o), even if some clothes items were donned and doffed as well. But if the vast majority of the time is spent in donning and doffing 'clothes' as we have defined that term, the entire period qualifies, and the time spent putting on and off other items need not be subtracted.

*Sandifer*, 134 S. Ct. at 881 (emphasis in original).

Applying the foregoing principles to the facts of this case, we hold that Appellants' donning and doffing of the uniforms and equipment at issue qualifies as "changing clothes" within the meaning of § 203(o). Appellants have pointed to the following items for Uniform Division officers: a uniform hat; uniform jacket; shirts; pants; dress blouse; leather gear; shoes/boots; socks; tie; winter/summer uniform;

31

sweaters; gloves; rainwear; bullet resistant vest; nightstick; handcuffs; nameplate; medals; awards; Shield and Department I.D. card; notebook and pen; firearm and ammunition; whistle; baton; watch; pepper spray (when issued); and a flashlight.[6] The first fourteen items clearly fit within the Supreme Court's definition of "clothes" set forth above: "they are both designed and used to cover the body and are commonly regarded as articles of dress." [7] *See id.* at 879. The last thirteen items, by contrast, do not satisfy the standard. We recognize that the number in each category is close, but we cannot say that the "vast majority of the time in question" is spent picking up, for example, a nightstick, handcuffs, nameplate, medals, awards, and a flashlight, or maintaining a department identification card and notebook and pen. Clearly, picking up and maintaining those items is not the same as donning and doffing the clothing at issue here. Accordingly, the vast majority of the time in question is spent donning and doffing "clothes" for purposes of § 203(o). Therefore, the entire period qualifies as time spent changing clothes or washing, and the time spent picking up or maintaining the other items need not be subtracted.

---

[6] Non-Uniform Division officers must have a conforming uniform available at all times and are subject to other requirements regarding their business garb, the majority of which consists of items that fit plainly within the definition of "clothes." App. at 110-111.

[7] Neither the District Court nor the parties to the case define or describe "leather gear." We presume it to mean holsters, belts, straps, boots, gloves and/or jackets, most of which are "clothes."

32

In sum, we conclude that there is a custom or practice under a bona fide CBA of not compensating Teaneck officers for time spent donning and doffing, and that the vast majority of the time in question is spent changing "clothes," as defined by the Supreme Court. Because both elements necessary for application of the § 203(o) exclusion apply to the instant case, the Teaneck officers are precluded from seeking compensation for time spent donning and doffing their uniforms and safety equipment.[8] Accordingly, we will affirm the District Court's grant of summary judgment as it relates to Appellants' donning and doffing claim.

## IV. CONCLUSION

For the reasons set forth above, we will affirm the order of the District Court.

---

[8] Because the § 203(o) exclusion applies, we need not address Appellants' argument that the remaining exclusion, regarding the preliminary and postliminary activities, does not apply.