**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-2842
_____

SECRETARY UNITED STATES DEPARTMENT OF
LABOR

v.

COMPREHENSIVE HEALTHCARE MANAGEMENT
SERVICES LLC; MAYBROOK-C KADE OPCO, LLC;
MAYBROOK-C EVERGREEN OPCO, LLC;
MAYBROOK-C WHITECLIFF OPCO, LLC;
MAYBROOK-C LATROBE OPCO, LLC; MAYBROOK-C
OVERLOOK OPCO, LLC; MAYBROOK-C SILVER OAKS
OPCO, LLC; MAYBROOK-C BRIARCLIFF OPCO, LLC;
MT LEBANON OPERATIONS LLC; MURRYSVILLE
OPERATIONS LLC; SOUTH HILLS OPERATIONS LLC;
CHESWICK REHABILITATION AND WELLNESS
CENTER, LLC; MONROEVILLE OPERATIONS LLC;
NORTH STRABANE REHABILITATION AND
WELLNESS CENTER, LLC; NORTH STRABANE
RETIREMENT VILLAGE, LLC; CHMS GROUP LLC;
SAMUEL HALPER, an individual,
Appellants
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2:18-cv-1608)
District Judge:  Honorable William S. Stickman IV

————————

Argued:  September 10, 2025

————————

Before:  CHAGARES, <u>Chief</u> Judge, PORTER and ROTH,
<u>Circuit</u> <u>Judges</u>

(Filed: June 3, 2026)

————————

Laura Bunting-Williams
Jackson Lewis
11 Stanwix Street
14th Floor
Pittsburgh, PA 15222

Jeffrey A. Schwartz [ARGUED]
Jackson Lewis
171 17th Street NW
Suite 1200
Atlanta, GA 30363

　　　　　<u>Counsel for Appellants</u>

Dean Romhilt [ARGUED]
United States Department of Labor
Office of the Solicitor
200 Constitution Avenue NW

Room N-2716
Washington, D.C. 20210

Counsel for Appellee

OPINION OF THE COURT
_____

CHAGARES, Chief Judge.

Comprehensive Healthcare Management Services LLC ("Comprehensive") owned and operated a number of healthcare facilities across Pennsylvania. Soon after Comprehensive acquired the facilities, the United States Department of Labor began investigating the facilities for wage and hour violations. As a result of its investigation, the Secretary of the Department of Labor (the "Secretary") filed suit against Comprehensive [1] on behalf of nearly 6,000 employees, alleging that Comprehensive violated several provisions of the Fair Labor Standards Act (the "FLSA").

The District Court held a bench trial and ultimately found in favor of the Secretary, awarding $35,804,438.20 in damages. Included in that sum was an award for "overtime" gap time — that is, compensation for non-overtime hours worked in a pay period when an employee has worked overtime hours. While we have held that claims for "pure" gap

_____

[1] In full, defendant-appellants include sixteen entities, as well as Samuel Harper, the chief executive officer of the facilities. For ease of reference, the Court will refer to defendant-appellants collectively as "Comprehensive."

3

time — compensation for non-overtime hours worked during pay periods when an employee has <u>not</u> worked overtime hours — are not cognizable under the FLSA, <u>Davis v. Abington Memorial Hospital</u>, 765 F.3d 236, 244 (3d Cir. 2014), we have not had occasion to consider whether claims for overtime gap time are viable. Today, for the reasons set forth below, we hold that they are not and will thus reverse the District Court's order on that ground.

We also address Comprehensive's additional claims of error. Namely, Comprehensive claims that the District Court impermissibly held the Secretary to a lower burden of proof on certain claims, committed clear error in several of its factual findings, and improperly concluded that certain Comprehensive employees were nonexempt under the FLSA. As set forth below, we are not persuaded by Comprehensive's first two arguments: the District Court applied the proper burden of proof, and its factual findings were not clearly erroneous. We do, however, agree that the District Court's exemption analysis was flawed and will thus remand for the District Court to conduct the proper analysis.

I.

We will briefly describe the relevant provisions of the FLSA to provide necessary context before turning to the facts of the instant case.

A.

Congress designed the FLSA to ensure that all covered employees receive a "fair day's pay for a fair day's work" and receive protection from the "evil of overwork as well as

4

underpay." Parker v. NutriSystem, Inc., 620 F.3d 274, 279 (3d Cir. 2010) (quoting Barrentine v. Ark.-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981)). To effectuate these goals, the FLSA imposes certain obligations on employers. Fundamentally, employers must pay their employees a minimum hourly wage for work performed, 29 U.S.C. § 206(a), and must pay one-and-one-half times the employees' regular rate for hours worked in excess of 40 hours per week, id. § 207(a)(2). The FLSA, however, exempts certain employees from its mandates, including any employee who is employed in a "bona fide executive, administrative, or professional capacity." Id. § 213(a)(1). We discuss these exemptions in more detail infra. Finally, the FLSA obligates employers to "make, keep, and preserve" records of the wages paid, hours worked, and other employment policies. Id. § 211(c).

B.

Comprehensive began acquiring healthcare facilities across Pennsylvania in 2014. By 2017, Comprehensive had amassed 15 residential nursing, rehabilitation, and assisted living facilities. The Department of Labor began investigating Comprehensive for wage and hour violations around that time. In 2018, the Secretary filed suit against Comprehensive in the United States District Court for the Western District of Pennsylvania, alleging that Comprehensive had violated the FLSA by, inter alia, failing to maintain adequate and accurate wage and hour records and failing to compensate employees at the appropriate rate and for the actual number of hours worked. The case proceeded to a bench trial in January of 2024.

At trial, the Secretary presented live testimony from 34 former and current Comprehensive employees, including at least one witness from 14 of Comprehensive's 15 facilities.[2] The District Court observed that the Secretary's witnesses "represented a broad cross-section of job types" across the facilities, giving "detailed testimony that was remarkably consistent" with both one another and with contemporaneous documentary evidence. Appendix ("App.") 74–75. The District Court found the Secretary's witnesses to be "clear, consistent, and credible," noting they often did not stand to gain anything from the litigation. App. 75.

Comprehensive, on the other hand, called 11 witnesses. The District Court found the testimony of these witnesses to be "narrow and inconsistent." App. 75. Comprehensive called only current, senior employees at Comprehensive whose testimony was not corroborated. Indeed, the District Court observed these witnesses' "seemingly selective memory" when faced with conflicting documentary evidence. App. 75. In light of these observations, the District Court found that Comprehensive's witnesses were "by and large . . . simply unworthy of belief." App. 77.

The District Court ultimately found in favor of the Secretary. The District Court first found that Comprehensive failed to maintain accurate records of employees' hours worked and wages paid, as the FLSA requires. This failure was in part due to Comprehensive's time clock system — the system through which employees would punch in and out of work. The court found that this system recorded employees'

---

[2] The Secretary also submitted 44 declarations from past and present Comprehensive employees.

punches inaccurately or failed to record them at all, even if the employee had used the system correctly. Indeed, Michael Murray, a Department of Labor information technology ("IT") specialist who reviewed Comprehensive's records, testified that there were hundreds of thousands of time-punches missing from Comprehensive's records.

This failure, the District Court found, led Comprehensive to miscalculate the wages its employees were due by (1) paying employees for their scheduled hours instead of the hours they actually worked and (2) failing to pay employees for working through their meal breaks. With respect to mealtime work, the District Court found that employees often worked through their meal breaks even though Comprehensive's time clock system automatically deducted employees' pay for meal breaks. While Comprehensive had a process in place for employees to seek compensation for that time, the District Court found that this process put the onus on employees, was "inconsistently administered[,] and [was] not remotely accurate." App. 92.

The District Court further found that Comprehensive failed to pay its employees the overtime wages they were due. And when Comprehensive did pay overtime, it did not do so at the correct rate. Specifically, the District Court found that Comprehensive miscalculated its employees' overtime rates by both failing to pay the required one-and-one-half times the employee's regular rate and miscalculating the regular rate in the first instance by failing to include shift differentials, bonuses, and other types of additional pay as required under the FLSA. The District Court considered these mistakes to be "systemic errors." App. 101. Finally, the District Court found that Comprehensive failed to pay overtime to certain

7

employees because Comprehensive misclassified them as exempt from the FLSA's overtime requirements.

Based on these findings, the District Court concluded that Comprehensive violated the FLSA and awarded $35,804,438.20 in damages, including compensation for overtime gap time. The District Court acknowledged that the "viability of overtime gap time claims has not explicitly been ruled upon" by our Court; nevertheless, the District Court concluded that failing to award such compensation "would run afoul of the FLSA's core remedial purposes." App. 119. Comprehensive filed a timely appeal.

## II.[3]

We first address Comprehensive's argument that the District Court erred by holding that claims for overtime gap time are cognizable under the FLSA. We then turn to Comprehensive's remaining claims of error: that the District Court erred by holding the Secretary to a lower burden of proof on certain claims, finding a broader pattern of FLSA violations than the evidence supported, and concluding that certain Comprehensive employees were nonexempt. We address each in turn below.

## A.

Comprehensive contends that the District Court erred in awarding damages for Comprehensive's non-payment of overtime gap time wages, arguing that claims for overtime gap

---

[3] The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over the District Court's final order pursuant to 28 U.S.C. § 1291.

8

time are not cognizable under the FLSA. We review the District Court's conclusion de novo, Ingram v. Experian Information Solutions, Inc., 83 F.4th 231, 236 (3d Cir. 2023), and, as set forth below, we will reverse.

We have explained that "gap time" generally

> refers to time that is not covered by [the FLSA's] overtime provisions because it does not exceed the overtime limit, and to time that is not covered by [the FLSA's] minimum wage provisions because, even though it is uncompensated, the employees are still being paid a minimum wage when their salaries are averaged across their actual time worked.

Davis, 765 F.3d at 243 (quoting Adair v. City of Kirkland, 185 F.3d 1055, 1062 n.6 (9th Cir. 1999)). Put differently, gap time means "non-overtime hours worked for which an employee is not compensated." Id. at 244.

We have held that so-called "pure gap time claims — straight time wages for unpaid work during pay periods without overtime — are not cognizable under the FLSA, which requires payment of minimum wages and overtime wages only." Id. (emphasis added). The Davis case did not, however, present us with an opportunity to consider whether overtime gap time claims are viable. See id.

Overtime gap time claims are claims "by an employee who exceeds the overtime threshold" but does not receive pay for all non-overtime hours worked. Id. So, for example, consider a nonexempt employee whose regular rate of pay is

9

well above the minimum wage. Assume that this employee works 43 hours in a certain workweek, but his employer only pays him for 38 hours of non-overtime work and three hours of overtime work.[4] If the employee sues under the FLSA seeking compensation for those two remaining hours of non-overtime work, he is asserting a claim for overtime gap time.

Two of our sister Courts of Appeals have already addressed this issue, reaching opposite conclusions. See Lundy v. Cath. Health Sys. of Long Island, Inc., 711 F.3d 106, 115–17 (2d Cir. 2013) (holding that claims for overtime gap time are not cognizable under the FLSA); Conner v. Cleveland County, 22 F.4th 412, 426 (4th Cir. 2022) (concluding such claims are viable). We now consider this question of first impression in our Court.

We hold that the FLSA does not afford a remedy for overtime gap time. The text of the FLSA is clear. The FLSA obligates employers to pay nonexempt employees: (1) a minimum wage, 29 U.S.C. § 206, and (2) overtime pay for hours worked in excess of 40 hours per workweek at a rate not less than one-and-one-half times employees' regular rate of pay, id. § 207. The text does not contemplate overtime gap time. See id. §§ 201–19; see also Davis, 765 F.3d at 244 ("[T]he FLSA . . . requires payment of minimum wages and overtime wages only."); Lundy, 711 F.3d at 116 (same). When the statutory language is clear, the text is the beginning and the

---

[4] This hypothetical assumes that this employee's regular rate of pay is sufficiently above the minimum wage such that his employer's failure to pay him for those two overtime hours does not run afoul of the FLSA's minimum wage requirement.

end of our inquiry. <u>Newton v. Comm'r Soc. Sec.</u>, 983 F.3d 643, 649 (3d Cir. 2020) (citation omitted).

The Secretary strains to find a textual hook, ultimately pointing to Congress's use of the words "regular rate" in § 207 and the fact that the FLSA's overtime requirement is premised on the calculation of an employee's "regular rate" of pay. Thus, in the Secretary's view, to satisfy the FLSA, employees must be paid their regular rates for all hours worked. But the statutory text simply does not support that inferential leap.[5]

---

[5] Our partially dissenting colleague also focuses on the term "regular rate." In her view, that term is ambiguous because "neither case law nor the [FLSA] establishes whether the regular rate, which is crucial to calculating the overtime wage, is the amount actually paid by the employer or the amount for which the employer contracted with the employee." Dissent at 2. The only way to resolve this ambiguity, the dissent urges, is to require an employer to pay the employee for all forty hours of non-overtime work at the contracted rate <u>before</u> calculating the overtime rate. This way, the actual rate, contracted rate, and regular rate are one and the same.

We agree that these rates <u>should</u> be the same. The question we face today is what happens when, due to the employer's errors, they are not — and, more specifically, does the FLSA provide a remedy for that error. We do not believe that it does. But an employee who finds himself or herself in this situation is not left without recourse: the employee may turn to his or her state's employment law or file a breach-of-contract action.

11

Resisting this conclusion, the Secretary turns to interpretive guidance from the Department of Labor that supports her view. That guidance provides that "extra compensation for the excess hours of overtime work under the [FLSA] cannot be said to have been paid to an employee unless all the straight time compensation due him for the nonovertime hours . . . has been paid." 29 C.F.R. § 778.315. We see no reason, however, to turn to the Department's guidance, as the statutory text is not ambiguous. See Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 295 (3d Cir. 2012) ("[W]e need reach the deference question *only* if we find the statutory language is ambiguous."). Congress's silence with respect to overtime gap time "does not render the statute ambiguous." Lundeen v. 10 W. Ferry St. Ops. LLC, 156 F.4th 332, 340 (3d Cir. 2025) (quoting United States v. Craveiro, 907 F.2d 260, 262 (1st Cir. 1990)). Rather, as we have explained, "[a]mbiguity exists only when, 'despite a studied examination of the statutory context, the natural reading of a provision remains elusive.'" Id. (quoting In re Price, 370 F.3d 362, 369 (3d Cir. 2004)). And as explained above, the natural reading of the FLSA is not elusive: the plain text does not contemplate a remedy for overtime gap time.

But even if we were to consider the Department's guidance on this issue, we would decline to afford it deference. We consider the Department's interpretive guidance and positions under the framework set forth in Skidmore v. Swift, 323 U.S. 134 (1944). Smiley v. E.I. Dupont De Nemours & Co., 839 F.3d 325, 329 (3d Cir. 2016).[6] Through that lens, an

---

[6] In 2024, the Supreme Court issued its decision in Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024), which overruled Chevron U.S.A., Inc. v. Natural Resources Defense

12

agency's interpretation is "'entitled to respect . . . , but only to the extent that' it has 'the power to persuade.'" <u>Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.</u>, 58 F.4th 696, 703 (3d Cir. 2023) (quoting <u>Christensen v. Harris County</u>, 529 U.S. 576, 587 (2000)). <u>Skidmore</u> deference asks us "to assign a 'weight' to an administrative judgment based on 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" <u>Hagans</u>, 694 F.3d at 304 (quoting <u>Skidmore</u>, 323 U.S. at 140).

The Department's interpretative guidance here does not hold such persuasive power. To be sure, the Department's position on this issue has been consistent for several decades. But the guidance provides no reasoning or support for its position. And we cannot square it with the statutory silence. Thus, even if we were to view the text as ambiguous, we would not find the Department's guidance, though consistent, to be persuasive. <u>Cf.</u> <u>K.D. ex rel. Dunn v. Downingtown Area Sch. Dist.</u>, 904 F.3d 248, 255–56 (3d Cir. 2018) (declining to give <u>Skidmore</u> deference to an agency opinion that "neither thoroughly considers nor validly reasons about the meaning of the statute" (cleaned up)); <u>Sanofi Aventis</u>, 58 F.4th at 703–04 (concluding that an agency interpretation is not persuasive when it makes a "giant leap from the text").

---

Council, Inc., 467 U.S. 837 (1984). <u>Loper Bright</u>, 603 U.S. at 412. The Court's decision in <u>Loper Bright</u>, however, did not disturb <u>Skidmore</u> deference. <u>See id.</u> at 394; <u>see also</u> <u>id.</u> at 476 (Kagan, J., dissenting) ("[T]he majority makes clear that what is usually called *Skidmore* deference continues to apply.").

13

Our conclusion today is in accord with the Court of Appeals for the Second Circuit's decision in Lundy. See Lundy, 711 F.3d at 115–17. There, the court explained that the text of the FLSA "simply does not consider or afford a recovery for gap-time hours," even when an employee works overtime hours in the same pay period. Id. at 116. The court was similarly unpersuaded by the Department's interpretative guidance because the Department "provide[d] no statutory support or reasoned explanation for this interpretation." Id. at 117.

The Court of Appeals for the Fourth Circuit diverged on this point, deferring to the Department's interpretative guidance "given the FLSA's silence regarding overtime gap time." Conner, 22 F.4th at 421. But as set forth above, we do not believe Congress's silence created an ambiguity; we thus see no need to resort to agency guidance. While the Department's reading may better serve "the policy objective of the FLSA overtime provision by ensuring employers do not mitigate or skirt the financial pressures of working their employees above the forty-hour threshold," id. at 422, that does not allow us to read into the FLSA a remedy that Congress did not create. "'Congress wrote the statute it wrote' — meaning, a statute going so far and no further." Lundeen, 156 F.4th at 341 (quoting Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 794 (2014)). Moreover, as the Court of Appeals for the Second Circuit observed, putative plaintiffs are not left without recourse — they may resort to state law. See Lundy, 711 F.3d at 116 (suggesting employees may bring "basic contract action[s]" under state law); see, e.g., 43 Pa. Cons. Stat. §§ 333.101, et seq. (Pennsylvania Minimum Wage Act); 43 Pa. Cons. Stat. §§ 260.1, et seq. (Wage Payment and Collection Law).

14

For these reasons, we conclude that the FLSA does not allow for overtime gap time claims. We will thus reverse this portion of the District Court's order and award.

## B.

We turn to Comprehensive's remaining arguments. Comprehensive first urges that the District Court erred by applying a lower burden of proof to certain of the Secretary's claims. We review this legal conclusion de novo, Martin v. Selker Bros., Inc., 949 F.2d 1286, 1292 (3d Cir. 1991), and we detect no error.

In Anderson v. Mt. Clemens Pottery Co., the Supreme Court explained that "[t]he solution" to the evidentiary problem created when an employer fails to keep adequate records of an employee's work "is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work." 328 U.S. 680, 687 (1946). An employee may instead prove a violation of the FLSA by "produc[ing] sufficient evidence to show the amount and extent of [uncompensated] work as a matter of just and reasonable inference." Id. If the employee produces such evidence, then "[t]he burden . . . shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." Id. at 687–88. If the employer fails to do so, then "the court may . . . award damages to the employee, even though the result be only approximate." Id. at 688.

Comprehensive contends that the District Court erred by applying the Mt. Clemens framework to all of the Secretary's claims. Rather, in Comprehensive's view, Mt. Clemens should not reach the Secretary's claims that (1) Comprehensive paid employees for their scheduled hours rather than for the hours they actually worked and (2) Comprehensive computed employees' overtime wages using incorrect regular rates. Comprehensive urges that these claims were not premised on inadequate recordkeeping, and thus Mt. Clemens does not apply.

At the outset of its analysis, the District Court noted that "[a]s a result of Defendants' recordkeeping violations, the *Mt. Clemens* burden-shifting framework applies," without specifying the claims to which the framework applied. App. 118. But as the Secretary points out, the damages the District Court awarded for the claims at issue were based on Comprehensive's own records; thus, Mt. Clemens did not affect the analysis for these claims.

With respect to the pay-by-schedule claim, the Secretary's damages model — which the District Court accepted — relied on Comprehensive's records to determine the number of hours a given employee worked and calculate the back wages owed. The same is true for the Secretary's claim of incorrect calculations of employees' regular rates. Indeed, the District Court emphasized that the damages awarded "were based upon Defendants' own time and pay records." App. 135. Accordingly, the core of the District Court's findings and award with respect to these claims was not impermissibly premised on Mt. Clemens.

Insofar as the District Court implied that the Mt. Clemens scheme applied to all claims, we disregard this statement as harmless error. See 28 U.S.C. § 2111 (providing that an appellate court "shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties").[7] We perceive no error because the District Court did not apply the Mt. Clemens burden-shifting framework to the disputed claims.

C.

Comprehensive next challenges three of the District Court's factual findings. We review the District Court's findings of fact for clear error. Covertech Fabricating, Inc. v. TVM Bldg. Prods., Inc., 855 F.3d 163, 169–70 (3d Cir. 2017). A factual finding is not clearly erroneous unless it "(1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff, 669 F.3d 374, 390 (3d Cir. 2012) (citation omitted). We see no clear error in the findings that Comprehensive disputes.

---

[7] It is not clear on this record that the application of the Mt. Clemens framework to these two claims would have been erroneous, as the scope and extent of these violations may have been masked by Comprehensive's inadequate recordkeeping. But because we conclude that the District Court did not apply the framework to these claims and the Secretary did not advance such an argument, we have no occasion to consider it here.

17

## 1.

Comprehensive first contends that the evidence at trial did not establish a pattern or practice through 2023 of paying employees based on scheduled hours, rather than hours worked. Comprehensive urges instead that the error was corrected in 2018. In support of this argument, Comprehensive highlights testimony from Abraham Pechman, the director of payroll at Comprehensive's corporate parent, in which he explained that after he started at Comprehensive in May 2018, he was not aware of any employees being paid based on their schedule as opposed to "punch to punch." App. 2288. The District Court, however, found that Pechman was not a credible witness. Without Pechman's testimony, Comprehensive identifies no evidence to support its argument. Moreover, Michael Shuey, a Department of Labor investigator, agreed that the "suggest[ion] . . . that the practice of paying according to schedule . . . had ceased" by May 2018 was not "consistent with what [he] heard from the[] employees" he had interviewed. App. 2096. His testimony is corroborated by, among other things, documentary evidence indicating that this practice persisted after May 2018. It thus cannot be said that the District Court's finding "bears no rational relationship to the supportive evidentiary data." Sidamon-Eristoff, 669 F.3d at 390 (citation omitted). Accordingly, the District Court did not commit clear error by finding that pay-by-schedule errors persisted beyond 2018.

## 2.

Comprehensive next argues that the evidence at trial did not establish a pattern or practice of miscalculating employees'

18

regular rates beyond July 2019.  Comprehensive acknowledges that employees' regular rates were improperly calculated prior to July 2019 but asserts that "uncontroverted evidence established that the issue was corrected in July 2019." Comprehensive Br. 18.  But again, Comprehensive's argument relies on testimony from Pechman, a witness the District Court found incredible.  Comprehensive thus fails to identify competent evidence to support its position.  On the Secretary's side, testimony from Michael Murray, a Department of Labor IT specialist who presented the Secretary's damages calculations, supports the court's finding.  Murray testified about an instance in January 2023 in which an employee's regular rate was miscalculated, and he further testified that "additional pay" was not "consistently included in the employees['] regular rate" as required.  App. 937–38.  Investigator Shuey also testified that he spoke to "at least a hundred" employees across Comprehensive's 15 facilities after the "2016, 2017 era" and that these employees continued to complain that bonuses and shift differentials were not being included in their regular rates.  App. 2095–98.  We therefore cannot conclude that the District Court's finding is "completely devoid of minimum evidentiary support" to constitute clear error.  Sidamon-Eristoff, 669 F.3d at 390 (citation omitted).

3.

Third, Comprehensive asserts that the trial evidence does not support a finding of a pattern or practice at all facilities of all employees working through their meal breaks every day through 2023.  The court's finding, however, was not as broad as Comprehensive claims.  Rather, the District Court concluded that "mealtime work was ubiquitous" across

19

Comprehensive's facilities and that "many employees" were "simply not paid" for mealtime work. App. 95. The court later clarified that it was "never . . . under the impression that every employee, every day, was unable to take a full, bona fide lunch." App. 133. The District Court explained that the evidence

> conclusively established that (1) employees often missed meal breaks or, at a minimum, did not routinely receive an uninterrupted 30-minute meal break; (2) actual practices related to employees punching in and out for lunch were inconsistent across [Comprehensive's facilities] during the relevant times; and (3) employees were not always paid for meal time work.

App. 133–34.[8]

The District Court's more limited finding is supported by the evidence introduced at trial, including, inter alia, testimony from 14 employees who stated that they had regularly worked during lunchtime without compensation. The court found each of these witnesses to be credible, noting its conclusion was "bolstered by the fact that each of them told the same story — despite working at different times and in different [Comprehensive facilities]." App. 91. The court also credited testimony from Comprehensive's regional consultant, noting that her testimony was "particularly illuminating and

---

[8] This finding is further bolstered by testimony from Murray, who explained that the Secretary's damages model — which was ultimately accepted by the Court — specifically accounted for employees who did not work through their meal breaks.

powerful" because she "regularly had her finger on the pulse of multiple [Comprehensive facilities]." App. 88 n.15. She, too, "credibly testified that employees worked through lunch." App. 88 n.15.[9]

Comprehensive argues that this evidence is quantitatively insufficient because only a small number of witnesses testified on behalf of the nearly 6,000 employees on whose behalf the Secretary brought claims. We have, however, often endorsed the practice of using "representative employees to prove violations with respect to all employees." Reich v. Gateway Press, Inc., 13 F.3d 685, 701–02 (3d Cir. 1994); see also Selker Bros., 949 F.2d at 1298 ("The testimony and evidence of representative employees may establish prima facie proof of a pattern and practice of FLSA violations."). It is thus "not necessary for every single affected employee to testify in order to prove violations or to recoup back wages." Selker Bros., 949 F.2d at 1298. And we recently clarified that "there is no brightline test establishing the percentage of employees necessary to achieve a representative sample." Sec'y U.S. Dep't of Lab. v. E. Penn Mfg. Co., 123 F.4th 643, 650 (3d Cir. 2024) (citation omitted). Indeed, in East Penn, we approved the use of a "small number" of employees as a

---

[9] Comprehensive specifically urges that it was error for the District Court to extend its finding to cover one facility — Latrobe — because the Secretary did not introduce any evidence of unpaid meal breaks at that facility. But Comprehensive's regional consultant oversaw the Latrobe facility and testified that unpaid mealtime work occurred "often" and "in many of [Comprehensive's] building[s]." App. 754. That testimony is sufficient to support the District Court's finding.

21

representative sample because they were "all subject to the same pay and uniform policies" that led to the violations. Id. (citation omitted). Thus, the proportionately small number of employee-witnesses that testified at trial does not alone render this evidence insufficient to constitute a representative sample.

The Secretary's evidence in this case was, qualitatively, strongly probative of systemic mealtime work violations. That evidence included testimony from employees across Comprehensive's facilities about their own experiences, testimony from employees about the experiences of their coworkers who, too, frequently worked through their meal breaks, and testimony from a regional consultant who had "her finger on the pulse" of Comprehensive's facilities, App. 88 n.15, as well as corroborating documentary evidence.

Finally, Comprehensive urges that there is no evidence to support the District Court's finding that the meal-break violations extended into 2023. That is not so. Investigator Shuey testified that employees worked through lunch "for the entire investigative period." App. 291. This testimony is sufficient to dispense with Comprehensive's claim of clear error.

In sum, the District Court did not clearly err in rendering these factual findings.[10]

---

[10] Comprehensive contends that these factual findings led the District Court to err in its damages award. Because we conclude that the factual findings identified by Comprehensive are not clearly erroneous, we need not address these arguments further.

22

D.

Comprehensive finally contends that the District Court applied erroneous legal standards when determining whether certain employees were exempt from the FLSA's guarantee of overtime pay. Whether an employee is covered by an exemption under the FLSA "is a mixed question of law and fact." Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 900 (3d Cir. 1991). We review the District Court's findings of fact for clear error but its application of law to fact de novo. See id.

The District Court observed that "[t]he burden of proof lies with the employer to demonstrate that an employee 'plainly and unmistakably' falls within an exemption" and that these exemptions should be "construed narrowly against the employer." App. 114–15 (citation omitted). The District Court, applying those standards, concluded that Administrators, Directors of Nursing, Dietary Directors, and Rehab Directors were properly classified as exempt as working in executive capacity. But the court determined that Comprehensive had failed to demonstrate "plainly and unmistakably" that Assistant Directors of Nursing, Maintenance Directors, Activities Directors, Nursing Supervisors/Unit Directors, and Housekeeping/Environmental Directors were exempt from the FLSA's overtime requirements. App. 120.

Comprehensive argues that the District Court applied incorrect and outdated legal standards in its exemption analysis. We agree. The Supreme Court has clarified that

23

FLSA exemptions should not be construed narrowly against an employer; rather, they must be given a fair reading. Encino Motorcars, LLC v. Navarro, 584 U.S. 79, 89–90 (2018). And an employer bears the burden of proving an employee's exempt status by a preponderance of the evidence, not plainly and unmistakably. E.M.D. Sales, Inc. v. Carrera, 604 U.S. 45, 54 (2025).

The Secretary concedes these errors but urges that they were harmless. This Court has recognized that "a non-constitutional legal error [is] harmless if it is highly probable that the error did not affect the judgment" under review. Gen. Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 329 (3d Cir. 2001). In making that determination, we "need not disprove every reasonable possibility of prejudice," but we "must be well-satisfied that the error did not prejudice a party." Id. We are not persuaded that the error was harmless.

The FLSA exempts certain employees from its overtime mandate, including any employee who is employed in a "bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Most relevant here, the executive exemption covers employees (1) who are compensated on a salary basis at the requisite level; (2) "[w]hose primary duty is management"; (3) "[w]ho customarily and regularly direct[] the work of two or more other employees"; and (4) "[w]ho ha[ve] the authority to hire or fire other employees or whose suggestions and recommendations" on change-of-status issues "are given particular weight." 29 C.F.R. § 541.100(a).

With respect to the salary criterion, the employee must regularly receive, subject to certain exceptions, "a predetermined amount constituting all or part of the

24

employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." Id. § 541.602(a). An employee, however, is not paid on a salary basis if the employer makes deductions from the employee's compensation for "absences occasioned by the employer or by the operating requirements of the business." Id. § 541.602(a)(2). An employer's "actual practice" of making such improper deductions demonstrates that the "employer did not intend to pay employees on a salary basis," and thus the exemption does not apply. Id. § 541.603(a). In determining whether an actual practice exists, courts consider the following factors, among others:

> the number of improper deductions, particularly as compared to the number of employee infractions warranting discipline; the time period during which the employer made improper deductions; the number and geographic location of employees whose salary was improperly reduced; the number and geographic location of managers responsible for taking the improper deductions; and whether the employer has a clearly communicated policy permitting or prohibiting improper deductions.

Id.

The Secretary asserts that the errors were harmless because Comprehensive failed to offer any evidence that any employee met the salary criterion of the executive exemption. The Secretary further points to evidence of deductions to argue that Comprehensive had an actual practice of making improper deductions such that the exemption does not apply. Whether

that evidence is sufficient to demonstrate an actual practice is a question we cannot resolve on this record because the District Court made no findings with respect to the salary criterion.

We will thus vacate this portion of the District Court's order and remand for the District Court to apply the proper standards and make additional findings.[11]  Accord E.M.D. Sales, 604 U.S. at 54 (remanding rather than applying the preponderance-of-the-evidence standard).

## III.

For the foregoing reasons, we will reverse in part, affirm in part, and remand for further proceedings consistent with this Opinion.

---

[11] Both before the trial court and on appeal, Comprehensive argued that, to the extent the executive exemption does not apply, other exemptions cover these employees.  Because the District Court did not make any findings with respect to other exemptions, we do not address their applicability here and instead leave them for the District Court to consider in the first instance.

ROTH, *Circuit Judge*, concurring in part, dissenting in part.

I did not join the judiciary because of my mathematical talent. However, given that the computation of wages is at the heart of this appeal, bear with me as we work through the following hypothetical. Imagine that you were paid in your job at a rate of $10 per hour. You worked every day, Monday through Friday, from 9:00 a.m. to 5:00 p.m. with one hour off for lunch, a total of 35 hours a week. But, on the week before Christmas, your boss made you stay late and skip your lunch hour every day, working from 9:00 a.m. to 6:00 p.m. without a break. Because you worked 45 hours that week, you were owed $400 for the first 40 hours of non-overtime work, plus an additional $75 for the five hours of overtime, a total of $475.[1] Yet, your boss paid you only $350, your pay for your normal 35-hour week.

Under the Majority's holding, even though your employer owes you $125 in unpaid wages, you may not be able to recover that amount under the FLSA. Instead, your recovery would be limited to $75 for the five hours of overtime. The $50 shortfall is often referred to as "overtime" gap time—the period between the end of your normal 35-hour work week and 40 hours, the time from which overtime is computed under the FLSA. This shortfall runs afoul of the statute's remedial purpose: "to ensure that all covered employees receive a fair day's pay for a fair day's work."[2] Because I would not reduce

---

[1] The FLSA requires employers to pay employees at least one and one-half times their regular rate for any hours worked over 40 in a given week. *See* 29 U.S.C. § 207.

[2] Maj. Op. 4 (internal quotation marks omitted).

your pay by disallowing overtime gap time claims, I respectfully dissent in part.[3]

The Majority holds that the FLSA's "text does not contemplate overtime gap time," and ends its analysis at the statute's plain text because it believes "the statutory language is clear."[4] But the statute's text is far from clear. 29 U.S.C. § 207 states that overtime wages for hours worked in excess of 40 are calculated as "one and one-half times the [employee's] regular rate."[5] The FLSA also defines the term "regular rate" as "all remuneration for employment paid to, or on behalf of, the employee" excluding certain discretionary payments.[6] However, neither case law nor the statute establishes whether the regular rate, which is crucial to calculating the overtime wage, is the amount actually paid by the employer or the amount for which the employer contracted with the employee.

Take the example I provided earlier. Your contracted hourly wage was $10 per hour, but you were paid for only 35 hours, totaling $350, despite working for 45 hours. One way to determine the regular rate for purposes of calculating overtime compensation is to simply use the contracted rate of $10 per hour. Another approach is to take the actual rate paid by the employer, which in this hypothetical would be $7.77 per

---

[3] I only dissent with respect to Part II.A of the Majority opinion.

[4] *Id.* at 10.

[5] The regular rate is distinct from the minimum wage. *See Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 577 (1942) (noting that 29 U.S.C. § 207 "calls for 150% of the regular, not the minimum, wage").

[6] 29 U.S.C. § 207(e).

hour ($350 divided by 45). While both approaches are technically consistent with the statute's text, determining which is correct is "integral to the issue of overtime payment under the FLSA."[7]

The case law in which the Supreme Court has attempted to define a regular rate is ambiguous and at times conflicting. The Court in *Walling v. Youngerman-Reynolds Hardwood Co.* explained the regular rate "must reflect all payments which the parties have *agreed* shall be received regularly during the workweek."[8] The word "agreed" suggests the dispositive rate is the one that was contracted for, since that is what the parties agreed upon.[9] But the Court in *Youngerman-Reynolds* also stated that the "regular rate coincides with the hourly rate *actually received* for all hours worked during the particular workweek, such rate being the quotient of the amount received during the week divided by the number of hours worked."[10] This phrasing implies the regular rate is based on the money

---

[7] *Smiley v. E.I. Dupont De Nemours & Co.*, 839 F.3d 325, 330 (3d Cir. 2016).

[8] 325 U.S. 419, 424 (1945) (emphasis added).

[9] *See Contract*, Black's Law Dictionary (2nd ed. 1910) (defining contract as "[a]n *agreement*, upon sufficient consideration, to do or not to do a particular thing") (emphasis added).

[10] *Youngerman-Reynolds*, 325 U.S. at 424 (emphasis added).

*actually* paid, not the contracted rate.[11]  This ambiguity is not limited to *Youngerman-Reynolds*—several Supreme Court cases mention both actual and contracted rates when discussing regular rates.[12]

In my view, the conflicting language in the case law reveals that the Supreme Court's determination of the regular rate is premised on the actual and contracted rates being one in the same.  For example, in *Youngerman-Reynolds*, the employer's contract set one wage for "straight time" under 40 hours and a lower figure for the regular rate used to calculate

---

[11] *See also Smiley*, 839 F.3d at 330 (defining regular rate as "rate per hour that is determined by dividing [the] total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours *actually* worked by him in that workweek for which such compensation was paid.") (internal quotation marks omitted) (alteration in original) (emphasis added).

[12] *See e.g.*, *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 464 (1948) (stating that the regular rate is calculated by "dividing the weekly compensation by the hours" worked, but also stating that the regular pay "must be drawn from what happens under the employment contract"); *Walling v. Helmerich & Payne*, 323 U.S. 37, 40, 42 (1944) (holding that "the [FLSA] clearly contemplates the setting of the regular rate in a bona fide manner through wage negotiations between employer and employee, provided that the statutory minimum is respected" but calculating the regular rate by "the simple process of dividing the wages received for each [shift] by the number of hours in that [shift]").

4

overtime compensation.[13]  The Supreme Court held that the arrangement was impermissible, explaining that the regular rate for overtime must be based on the contracted rate used to pay straight time wages.[14]  The Court assumed that at least with regard to the first forty hours worked within a workweek, the employees were paid at the rate they had contractually agreed upon.

To avoid a conflict with Supreme Court precedent, the actual rate, contracted rate, and regular rate should be the same. The three rates can match only if employers pay employees for all 40 hours of straight time at the contractually agreed upon rate *before* calculating the overtime wage.  Requiring employers to do so means that employees can recover overtime gap time wages under the FSLA.  The Majority overlooks that its holding—that the FLSA does not cover overtime gap time—creates avoidable ambiguity in determining the regular rate, an issue easily resolved by requiring the three rates to match.

In addition, the Department's interpretive guidance, which states that an employer has not paid an employee overtime compensation unless it has also paid the employee "all the straight time compensation due him for the nonovertime hours *under his contract*" aligns with my position.[15]  Moreover, I believe we owe the Department's interpretive guidance deference under *Skidmore v. Swift & Co.*,

---

[13] *Id.* at 425.  "Straight time" refers to normal working hours, as opposed to overtime.  *See Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 244 (3d Cir. 2014).

[14] *Youngerman-Reynolds*, 325 U.S. at 425–26.

[15] 29 C.F.R. § 778.315 (emphasis added).

as agency interpretations of statutes "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."[16]

The Majority does not afford the Department's interpretation any deference because it believes the guidance does not hold "persuasive power."[17] I disagree and would adopt the position of the Court of Appeals for the Fourth Circuit, which held in *Conner v. Cleveland Cnty* that the Department's overtime gap time guidance was entitled to *Skidmore* deference because of its longstanding nature.[18] The guidance has remained unchanged since 1968, and has been referred to in numerous other Department interpretations and administrative decisions, "thereby confirming [its] continued validity and relevance."[19] The longstanding nature of the Department's interpretation, which the Majority unduly minimizes, weighs heavily in favor of *Skidmore* deference.[20] Ultimately, recognizing overtime gap time claims effectuates the FLSA's goal of ensuring that employers "do not mitigate or skirt the financial pressures of working their employees above the forty-hour threshold."[21]

My position is also grounded in common sense. I simply do not know what regular rate to use to calculate overtime wages unless the employer has paid the employee the wages they are due for the first forty hours. The Majority's

---

[16] 323 U.S. 134, 140 (1944).
[17] Maj. Op. 13.
[18] *Conner v. Cleveland Cnty*, 22 F.4th 412, 422 (4th Cir. 2022).
[19] *Id.*
[20] *Id.*
[21] *Id.*

rule also produces an untenable result—employees have little incentive to work beyond forty hours if they are not fully compensated for all hours worked. Although the Majority suggests employees can resort to state contract law to recover for their unpaid gap time wages, that reasoning is at odds with the FLSA's role in setting a baseline for labor protections. Had Congress believed employees should rely on private litigation to protect their interests, it would not have enacted the FLSA.

For these reasons, I respectfully dissent in part.